UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:   Judges Petty, Chafin and Senior Judge Frank
Argued at Norfolk, Virginia


EDWARD MICHAEL ZINNER

                                                    MEMORANDUM OPINION* BY
v.       Record No. 1289-17-1                       JUDGE ROBERT P. FRANK
                                                    NOVEMBER 6, 2018

COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
                            A. Bonwill Shockley, Judge

            Kristin Paulding (7 Cities Law, on brief), for appellant.

            Donald E. Jeffrey, III, Senior Assistant Attorney General (Mark R.
            Herring, Attorney General; Christopher P. Schandevel, Assistant
            Attorney General, on brief), for appellee.


        Edward M. Zinner, appellant, was convicted in a bench trial of driving under the influence

of alcohol ("DUI"), first offense.[1]  He argues on appeal that the trial court erred in allowing a

forensic toxicologist to testify regarding appellant's blood alcohol content ("BAC") at the time of

the offense based on "retrograde extrapolation."  He also asserts that the evidence was insufficient

to prove him guilty of DUI.  We affirm his conviction.

        Viewed in the light most favorable to the Commonwealth, Wells v. Commonwealth, 65

Va. App. 722, 725, 781 S.E.2d 362, 364 (2016), the evidence shows that at approximately

7:00·p.m. on November 29, 2015, Joshua Kottke and his family were traveling to a Target store

in their 2011 Dodge Durango.  Joshua's wife, Leah, was driving.  Their three children were

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Appellant also was convicted of felony hit and run, but that conviction is not before us.

riding in the backseats.  After pulling up to a stop sign, Leah made a right turn onto Shore Drive.

Joshua heard her exclaim, "Oh, my God!  I think this guy is going to hit us!"

Joshua braced for impact as a white Cadillac CTS—which was changing lanes—struck

the Kottkes' vehicle from behind.  Joshua heard a "loud thud," and the Durango flipped a few

times before skidding into the oncoming lanes and coming to a stop upside-down on its roof.[2]

The Kottkes all were able to exit the vehicle.

After confirming that his wife and children were safe, Joshua walked back towards the

Cadillac to check on the vehicle's driver.  When he got there, he found appellant sitting in the

driver's seat.  Appellant then got out of the car but stumbled as he did so, and Joshua noticed that

he had difficulty standing up.  Appellant had a cut on his forehead that was bleeding.[3]

Appellant asked Joshua, "What happened?"[4]  Joshua immediately smelled alcohol.

Joshua also observed appellant's eyes were droopy, he was slurring his words, and he seemed to

be incoherent.  After telling appellant that he was calling the police, Joshua returned to his

vehicle.

Sometime after the police and medical personnel had arrived at the scene, one of the

officers asked Joshua to take him to the driver of the other vehicle involved in the accident.

Joshua led the officer back to the white Cadillac, but appellant was gone.

---

[2] There was no testimony as to appellant's speed prior to impact.

[3] Appellant's medical records upon his admission to Sentara Virginia Beach General Hospital indicated that appellant had a "small abrasion on his right scalp, not actively bleeding." Further, there was no evidence of intra-cranial injury.  The admissibility of the record is not before this Court.  Further, Officer B.J. Flynn, who responded to the accident scene, testified that the cut on appellant's forehead had been described in a police dispatch as "superficial."

[4] Joshua, on cross-examination, indicated that it appeared appellant did not know he had been in an accident.

- 2 -

Approximately six hours after the accident, Detective Andre Jerry with the Virginia Beach Police Department responded to a call from a homeowner reporting a man passed out face down in the dirt under some bushes next to the homeowner's house. The house was located about one mile away from where the accident had occurred earlier that evening. Detective Jerry arrived at the house at 12:56 a.m. He and a firefighter pulled the man out of the bushes. The detective located the man's wallet and identified him as appellant. Appellant smelled of alcohol.

Appellant was transported to Sentara Hospital, and Detective Jerry followed. On the way to the hospital, appellant lapsed in and out of consciousness. At the hospital, Detective Jerry tried to speak with appellant, but appellant was unable to answer any of the detective's questions. The detective left.

According to hospital records, appellant appeared to be intoxicated. He told medical personnel repeatedly, "I was driving my car, I drank tonight[,] however[,] I'm not suppose [sic] to drink." At approximately 1:55 a.m., appellant's blood was drawn. Tests revealed that he had a blood alcohol content ("BAC") level between 0.20 and 0.22% by weight by volume. A CT scan of appellant's head was normal.

Detective Jerry returned to the hospital at about 9:15 a.m. on November 30, 2015, and interviewed appellant. When asked if he had been driving a white Cadillac, appellant admitted that he had and further said that he "shouldn't have been driving at all." Appellant added that he had diabetes, had taken a Xanax, had been drinking, and was "guilty." Appellant also told the detective that he had been "drinking and driving," explaining that he was "going through a lot with his business and that's why he was drinking."

When Detective Jerry asked appellant about the accident, appellant inquired if anyone was hurt. Appellant was "very apologetic" throughout the interview. Appellant stated that he

remembered drinking at a sports bar on Shore Drive, and he told the detective that he had not had anything to drink since the accident.

At trial, the Commonwealth called Dr. Connie Luckie, a forensic toxicologist, as an expert witness in toxicology and the effects of alcohol. On direct examination, Dr. Luckie was asked to define "retrograde extrapolation." Dr. Luckie explained that "[r]etrograde extrapolation is going backward in time . . . to give a concentration of someone's blood alcohol concentration" at an earlier time, "like [the] time of a crash or the time of a stop." She testified that retrograde extrapolation is "widely accepted in [her] field" and that she could perform the extrapolation "to a reasonable degree of medical probability or certainty." Dr. Luckie admitted that the process "has assumptions," but may be done with alcohol "[b]ecause ethanol itself has a metabolic profile that allows for a linear elimination." When appellant objected that Dr. Luckie's testimony was based on assumptions, the trial court asked the prosecutor to lay some additional foundation.

Dr. Luckie elaborated on the various assumptions that forensic toxicologists rely on when performing retrograde extrapolation. She testified that the "biggest assumption" is "that the person has fully absorbed all the alcohol they have consumed up to that point," which requires assuming "that their drinking period has ended approximately an hour prior to the crash, the incident, [or] the stop." Dr. Luckie said that absent this assumption, "you're going to falsely elevate their concentration . . . ." Other necessary assumptions are that the person is "an average human being [with] normal physiological functions," which among other things means not being an alcoholic, "as well as [that] they did not have any alcohol to consume after the time of the incident."

The prosecutor next asked Dr. Luckie if, "knowing that we have a .20 to .22 alcohol blood concentration at 1:45 a.m. on November 30th," would she be "able to perform retrograde

extrapolation to determine what a normal person's BAC would have been seven hours prior on November 29th, 2015 at 6:50 p.m." She answered in the affirmative.

Appellant again objected to Dr. Luckie's testimony concerning retrograde extrapolation because it was based on assumptions. The trial court overruled the objection.

The doctor then testified that using a certain formula, based on a human being's absorption rate, the BAC would be 0.27 to 0.34 by weight by volume at the time of the accident. She again clarified that the result assumes "they have not [drunk] alcohol in that seven-hour period and that they were fully absorbed at the time of the accident." The calculation "would change" if the person drank up to the time of the accident, "depend[ing] on how much they've [drunk]."

Dr. Luckie also testified about the effects that a BAC level between 0.27 and 0.34 would have on someone's ability to drive a vehicle, stating that the person's vision, judgment, and coordination would be affected adversely. She admitted, however, that she could not testify to the extent of the effects that BAC level would have had on appellant specifically because "[t]he degree is solely going to depend on his familiarity with alcohol." "All the adverse observations, the judgment, attention control, [and] vision, are going to impact him." But "[t]he more familiar he is with alcohol, he could handle a little bit higher concentration of BAC than a different person, so I don't know the answer," Dr. Luckie concluded.

On cross-examination, Dr. Luckie admitted that she did not know when appellant had consumed his last drink, how many drinks he had consumed, or in what time frame he had consumed them. She further admitted that other factors affected the general absorption of alcohol, i.e., eating, the type of alcohol and how fast it is being drunk, and how familiar the person is with alcohol. Dr. Luckie agreed that "the Commonwealth's hypothetical asked [her] to assume a lot for a seven-hour difference."

In response to a question from the trial court whether it would have been possible for appellant's BAC to have been lower than a 0.20 or a 0.22 when the accident occurred, Dr. Luckie confessed, "You would have to know his drinking." She said that even assuming appellant had nothing to drink after the accident, "you have to know that he's fully absorbed, so if he was drinking fifteen to twenty minutes prior to the accident at 6:55, he may not have been at a .22." Because he would have fully absorbed the alcohol by the time of the blood draw seven hours later, Dr. Luckie could not definitely answer the court's question.

In denying appellant's motion to strike the evidence, the trial court pointed to the evidence that appellant's speech was slurred, that he smelled of alcohol, that he had droopy eyes, that he had passed out some distance from the accident scene, and that he admitted drinking and driving. The court found appellant guilty of DUI, first offense. This appeal follows.

ANALYSIS

A. DR. LUCKIE'S TESTIMONY

Appellant contends that the trial court erred in accepting Dr. Luckie's expert testimony because it was based on assumptions, not facts.

The "admission of expert testimony is in the sound discretion of the trial court." Payne v. Commonwealth, 277 Va. 531, 542, 674 S.E.2d 835, 841 (2009). However, "[e]xpert testimony founded upon assumptions that have no basis in fact is not merely subject to refutation in cross-examination or by counter-experts; it is inadmissible." Toraish v. Lee, 293 Va. 262, 269, 797 S.E.2d 760, 763 (2017) (quoting Norfolk S. Ry. v. Rogers, 270 Va. 468, 479, 621 S.E.2d 59, 65 (2005)); see Tarmac Mid-Atlantic v. Smiley Block Co., 250 Va. 161, 166, 458 S.E.2d 462, 466 (1995) (holding that expert testimony cannot be speculative or founded upon assumptions that have an insufficient factual basis). Thus, a trial court's decision to admit such unsupported

testimony is "subject to reversal on appeal." Vasquez v. Mabini, 269 Va. 155, 160, 606 S.E.2d 809, 811 (2005).

Even when an appellate court finds error in the admissibility of expert testimony, it must still determine if the error was harmless. Jones v. Commonwealth, 50 Va. App. 437, 446, 650 S.E.2d 859, 863 (2007). We "will not reverse a trial court for evidentiary errors that were harmless to the ultimate result." Carter v. Commonwealth, 293 Va. 537, 544, 800 S.E.2d 498, 502 (2017) (quoting Shifflett v. Commonwealth, 289 Va. 10, 12, 766 S.E.2d 906, 908 (2015)). Virginia's harmless error statute, Code § 8.01-678, states:

> When it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached, no judgment shall be arrested or reversed . . . [f]or any . . . defect, imperfection, or admission in the record, or for any error committed on the trial.

Under the standard for non-constitutional harmless error, "such error is harmless if we can be sure that it did not 'influence the jury' or had only a 'slight effect.'" Shifflett, 289 Va. at 12, 766 S.E.2d at 908 (quoting Clay v. Commonwealth, 262 Va. 253, 260, 546 S.E.2d 728, 731-32 (2001)); accord Carter, 293 Va. at 545, 800 S.E.2d at 502.

Assuming without deciding the trial court erred in allowing Dr. Luckie's testimony, we find such error to be harmless.

There was much other evidence properly before the court on which to convict appellant of driving under the influence at the time of the accident. He smelled of alcohol, his speech was slurred, and his eyes were droopy. He seemed incoherent. He had rear-ended Joshua's van, but did not remember being in an accident. He stumbled as he exited his car and had difficulty standing up. Appellant left the scene and was found six hours later about a mile away, unconscious and smelling of alcohol. He admitted to Detective Jerry that he had been drinking and driving and was "guilty." He said that he was not supposed to drive and should not have

been driving. The hospital records indicated that seven hours after the accident appellant's BAC level was between 0.20 and 0.22%, and he still exhibited signs of intoxication at the hospital.

From this evidence alone, without Dr. Luckie's testimony, it plainly appears that appellant had "a fair trial on the merits and substantial justice has been reached." Code § 8.01-678. Thus, error, if any, was harmless.

## B. SUFFICIENCY

Appellant challenges the sufficiency of the evidence, claiming there was no evidence of his alcohol consumption, nor whether his alcohol consumption affected his ability to drive. He further argues there is no evidence of what caused the accident and that his manner, appearance, speech, and muscular movement easily could have been attributable to the impact of the accident rather than to intoxication.

The standard of review when the sufficiency of the evidence is challenged on appeal in a criminal case is well established.

> An appellate court does not "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." Rather, the relevant question is whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." We review the sufficiency of evidence supporting a conviction "in the 'light most favorable' to the Commonwealth."

Commonwealth v. Moseley, 293 Va. 455, 463, 799 S.E.2d 683, 688 (2017) (citations omitted).

Further, "[t]he fact finder, who has the opportunity to see and hear the witnesses, has the *sole* responsibility to determine their credibility, the weight to be given their testimony, and the inferences to be drawn from proven facts." Commonwealth v. McNeal, 282 Va. 16, 22, 710 S.E.2d 733, 736 (2011) (quoting Commonwealth v. Taylor, 256 Va. 514, 518, 506 S.E.2d 312, 314 (1998) (emphasis added); accord Hamilton v. Commonwealth, 279 Va. 94, 105, 688 S.E.2d 168, 175 (2010).

- 8 -

We will affirm the judgment of the trial court unless it appears from the evidence that such judgment "is plainly wrong or without evidence to support it." Singleton v. Commonwealth, 278 Va. 542, 548, 685 S.E.2d 668, 671 (2009). See also Code § 8.01-680.

Code § 4.1-100 defines "intoxicated" as "a condition in which a person has drunk enough alcoholic beverages to observably affect his manner, disposition, speech, muscular movement, general appearance or behavior." The evidence established that appellant rear-ended Joshua's van, at a speed which caused the vehicle to flip over and be propelled into the oncoming lane of traffic. Appellant's speech was slurred, his eyes droopy, he smelled of alcohol, he was incoherent, he stumbled when exiting his car, and he had difficulty standing upon exiting. He said he did not remember being in the accident, but he admitted drinking and driving and told Detective Jerry that he was guilty. Further, appellant was found unconscious several hours later about a mile from the scene of the accident. He appeared to be intoxicated at the hospital. His BAC, taken approximately seven hours after the accident, was between 0.20 and 0.22% by weight by volume.

Appellant argues his manner, speech, and muscular movement may be equally attributable to the injury he sustained in the accident. Yet, his medical records revealed he had only a "small abrasion" on his right scalp that was not bleeding. There was no evidence of intra-cranial injury. Further, the trial court expressly rejected the testimony of the doctor who had examined appellant eleven months after the accident and diagnosed him with post-concussive syndrome.

The overwhelming evidence is that appellant's intoxication, not the accident, caused his behavior and appearance at the scene. "[W]hen 'faced with a record of historical facts that supports conflicting inferences,' a court reviewing the sufficiency of the evidence 'must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such

- 9 -

conflicts in favor of the prosecution, and must defer to that resolution.'" Harper v. Commonwealth, 49 Va. App. 517, 523, 642 S.E.2d 779, 782 (2007) (quoting Jackson v. Virginia, 443 U.S. 307, 326 (1979)). We conclude that appellant had drunk enough alcohol to affect his manner, disposition, speech, muscular movement, and behavior. Thus, we find that appellant is guilty of driving while intoxicated.

Affirmed.